RECORD NUMBER: 14-1333

# United States Court of Appeals
### *for the*
# Fourth Circuit

---

**JEFFREY S. HODGES, TOMMY LEE BONDS,
JOHN PAUL SPANGLER,**

*Appellants,*

– v. –

**FEDERAL-MOGUL CORPORATION; Q-TECH EQUIPMENT &
SERVICES OF THE CAROLINAS, L.L.C.; CARRINGTON
ENGINEERING SALES, CO.; DUSTEX CORPORATION; THE KIRK &
BLUM MANUFACTURING COMPANY; K&B DUCT,**

*Appellees.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE**

## OPENING BRIEF OF APPELLANTS

---

**NEAL STANLEY JOHNSON**
**JOHNSON LAW PLC**
**120 Day Avenue, SW, Suite 200**
**Roanoke, Virginia 24016**
**T: (540) 777-5297**

**E. KYLE MCNEW**
**MICHIEHAMLETT, PLLC**
**500 Court Square, Suite 300**
**Charlottesville, Virginia 22902**
**T: (434) 951-7234**

**PETER BRENT BROWN**
**BROWN & JENNINGS PLC**
**30 Franklin Road, Suite 700**
**Roanoke, Virginia 24011**
**T: (540) 444-4010**

*Counsel for Appellants*

---

 **CP** COUNSEL PRESS • VA – (800) 275-0668

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1333__     Caption: __Hodges, et al. v. Federal Mogul Corp., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Jeffrey S. Hodges, Tommy Lee Bonds, John Paul Spangler
(name of party/amicus)

_____

 who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              ☐ YES ☑ NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ E. Kyle McNew _____     Date: _____ 4/11/14 _____

Counsel for: Appellants _____

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ 4/11/14 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ E. Kyle McNew _____          _____ 4/11/14 _____
(signature)                                                    (date)

- 2 -

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION .............................................................. 2

STATEMENT OF ISSUES .......................................................................... 3

STATEMENT OF THE CASE ...................................................................... 3

    1.    Procedural Posture ....................................................................... 3

    2.    Statement of Facts ....................................................................... 4

        a.    The configuration of the Federal-Mogul facility ............... 4

        b.    The design and construction of the Federal-Mogul aluminum dust evacuation system violated industry standards ........................................................................... 5

        c.    The circumstances surrounding the fire that injured Hodges, Bonds, and Spangler ........................................... 8

SUMMARY OF ARGUMENT ................................................................... 13

ARGUMENT .............................................................................................. 14

    1.    Standard of Review ................................................................... 14

    2.    The District Court inappropriately rejected Hodges's Testimony ................................................................................... 15

    3.    The district court improperly rejected the evidence corroborating Hodges's testimony ........................................... 18

i

4.   The district court's decision contravenes this Court's precedent on eyewitness testimony .......................................... 19

5.   The district court exceeded its authority in granting summary judgment .................................................. 21

CONCLUSION ............................................................ 23

STATEMENT REGARDING ORAL ARGUMENT ................................. 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................ 15

*Feliciano v. City of Miami Beach*,
707 F.3d 1244 (11th Cir. 2013) .................................... 17, 18

*Gray v. Spillman*,
925 F.2d 90 (4th Cir. 1991) ................................................ 22

*Mann v. Failey*,
__ F. App'x__, 2014 WL 3511878 (4th Cir. July 17, 2014)............ 22

*McAirlaids Inc. v. Kimberly-Clark Corp.*,
756 F.3d 307 (4th Cir. 2014) ................................................ 1

*Minyard Enters. Inc. v. Se. Chem. & Solvent Co.*,
184 F.3d 373 (4th Cir. 1999) .......................................... 1, 19, 20, 21

*N.L.R.B. v. Hartley Oil Co., Inc.*,
210 F.3d 361 (4th. Cir. 2000) ...................................... 1, 16

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir.2011) ................................................ 14

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)................................................................ 15

*Thompson v. Hall*,
883 F.2d 70 (4th Cir. 1989) ................................................ 15

**Rules, Statutes and Other Authorities**

28 U.S.C. § 1291 .............................................................. 2

28 U.S.C. § 1332 .............................................................. 2

## **INTRODUCTION**

If a witness testifies that a traffic signal was green, it would be passing strange for a court to find as a matter of law that there is no evidence that the light was green. It would be error for the court to grant summary judgment on that basis. This is so even when the witness is subject to cross examination because of inconsistencies or questions about his testimony. As long as the witness holds to the "heart" of his testimony, the rest is a credibility question. *N.L.R.B. v. Hartley Oil Co., Inc.*, 210 F.3d 361 (Table) (4th. Cir. 2000); *Minyard Enters. Inc. v. Se. Chem. & Solvent Co.*, 184 F.3d 373, 381 (4th Cir. 1999). And, of course, it is improper to grant summary judgment on the basis of evidentiary weight or credibility questions. *McAirlaids Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 314 (4th Cir. 2014).

Yet that is exactly what happened in this case. The question in this appeal is where the fire that seriously injured Jeffrey Hodges, Tommy Lee Bonds, and John Paul Spangler started. Did it start inside of the Federal-Mogul facility in Blacksburg, Virginia, or outside in a "baghouse" where combustible material was collected? The Plaintiffs offered both expert and lay witness testimony that the fire originated outside of the facility, either of which alone would be sufficient to meet the Plaintiffs' burden on this question. The district court struck the expert testimony on fire origin under *Daubert*, and that ruling is not at issue in this appeal.

But in the fervor of striking the expert testimony, the district court threw the proverbial baby out with the bathwater when it disregarded the lay testimony and evidence.

The court simply discredited Hodges's testimony that he saw the fire coming at him in ductwork from outside of the building. It did so based on what it characterized as an inaccuracy in his testimony about the configuration of a piece of equipment in the ductwork. Focusing on this inaccuracy was improper because the piece of equipment was not the "heart" of Hodges' testimony. That a ball of fire was coming at him from beyond the piece of equipment was the heart of his testimony. That testimony was not physically impossible, and indeed was corroborated by other testimony and video evidence. It was therefore error for the district court to grant summary judgment.

## STATEMENT OF JURISDICTION

The district court exercised jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in light of complete diversity of citizenship amongst the plaintiffs and defendants and an amount in controversy in excess of $75,000. This Court has appellate jurisdiction over this matter pursuant to 28 U.S.C. § 1291 because this is an appeal from a final order issued by the United States District Court for the Western District of Virginia on March 7, 2014. The Appellants timely noted their

2

appeal April 4, 2014. This appeal is from a final judgment that disposes of all parties' claims. A4194.

## STATEMENT OF ISSUES

1. Whether the district court erred in granting summary judgment despite admissible lay witness testimony and other evidence that created a genuine question on the material fact of the origin of the fire in this case.

## STATEMENT OF THE CASE

**1.    Procedural Posture**

Plaintiff-Appellants Hodges, Bonds and Spangler filed a Complaint against Appellee Federal-Mogul Corporation on August 6, 2012, and joined the remaining Defendant-Appellees by Amended Complaint filed December 26, 2012, A18. The case proceeded through discovery, at the close of which the Defendants filed *Daubert* motions to strike the Plaintiffs' experts and motions for summary judgment. Plaintiffs opposed. The district court heard argument on these motions on January 24, 2014, A3818-968, and February 7, 2014, A4028-157. The district court issued a Memorandum Opinion and an Order on March 7, 2014, granting the *Daubert* motions as to the Plaintiffs' experts' fire cause and origin opinions and granting summary judgment. A4160-95. Appellants timely noticed their appeal on April 4, 2014. A4196.

3

2.     **Statement of Facts**

Hodges, Bonds, and Spangler were injured on December 31, 2010, by a fire that occurred at a factory owned by Federal-Mogul in Blacksburg, Virginia. Federal-Mogul engages in a manufacturing process that requires bonding aluminum to steel. The process creates aluminum dust as a byproduct, and aluminum dust is very combustible. A4160.

a.     **The configuration of the Federal-Mogul facility**

To deal with the dust, Federal-Mogul had a system installed to collect the dust and remove it from the facility to be deposited in a "baghouse." A baghouse is generally a storage container located outside of a facility that holds particulates or gases that result from certain industrial processes. In this case, Federal-Mogul worked with Appellee Carrington to design and install the dust removal system. The system used fans and ductwork to collect aluminum dust from inside the facility and transport it through a hole in the exterior wall to the baghouse. The baghouse was designed by Appellee Dustex. A4160-61.

At the point where the ductwork went through the hole in the wall of the Federal-Mogul facility, there was a device called a "back-blast damper." It was essentially a hinged safety mechanism intended to allow material from inside of the facility to exit towards the baghouse but to prevent the opposite. In other words, the back-blast damper existed, at least in part, to make the ductwork a one-

4

way route, to prevent harmful materials, including fire, from escaping the baghouse and going back into the facility. The back-blast damper was designed by Appellee Kirk & Blum. A4161.

**b.    The design and construction of the Federal-Mogul aluminum dust evacuation system violated industry standards.**

Fires are a concern for any industrial facility, so the industry has developed and settled upon industry standards for the prevention of fires and for the investigation of fires. Those standards are promulgated by the National Fire Protection Association ("NFPA"). As the district court recognized, many courts have recognized the NFPA standards as authoritative in fire cases. A4165. Specifically related to facilities that deal with aluminum filings or dust, the NFPA has observed that,

> industry experience has clearly demonstrated that **an eventual explosion can be expected where a bag or media-type collector is used to collect aluminum fines**. Seldom, if ever, can the source of the ignition be positively identified.

A3797 (emphasis added).[1] In other words, when it comes to aluminum dust being stored in a baghouse, a fire is not a mere possibility. It is a borderline eventuality. And when it happens, the cause of the fire will always be hard to determine because everything is burnt.

_____

[1] Indeed, Federal-Mogul had experienced a baghouse explosion at its plant in Italy prior to the explosion in this case. *E.g.* A700.

Because of this recognized inevitability of a fire, the NFPA requires certain safeguards to prevent the fire from spreading to the facility where people are working. One such safeguard is venting so that if there is a combustion event, the pressure in the baghouse can be released in a controlled manner instead of all at once like a balloon bursting. One of the Plaintiffs' experts, Martin Schloss,[2] compared the vents that were designed, manufactured and sold by Dustex in this case to the venting specifications set forth in the NFPA standards. He found that whereas the NFPA standards would require an explosion relief vent of 1.16 to 1.23 square meters, the vent on the baghouse at the Federal Mogul facility was only 0.68 square meters. A445. **Thus, the venting on the Federal-Mogul baghouse was only about half of what it should have been per NFPA standards.**

Another safeguard when using a baghouse system to store combustible aluminum filings is a barrier between the baghouse and the factory that would prevent a fire that starts in the baghouse from intruding into the facility. In this case, that barrier was the back-blast damper sold by Kirk & Blum to Carrington and, in turn, from Carrington to Federal Mogul. A447. As Mr. Schloss explained, "a back-blast damper is an isolation device that prevents a deflagration from

---

[2] The district court excluded Mr. Schloss's expert testimony as it related to fire cause and origin, and that ruling is not at issue in this appeal. However, Mr. Schloss also offered expert testimony on the baghouse design and its adherence to industry standards. The district court did not exclude that testimony, so it is properly considered on appeal.

propagating back upstream in duct work in the event of a baghouse explosion." A447. The damper is designed to have a gate or flap that allows air and particulates to travel "downstream" from the facility to the baghouse. But, "should a pressure wave from an explosive blast in the baghouse propagate back through the ductwork in the reverse direction of the normal airflow, it should force the blade down to prevent the fire that immediately follows the pressure from passing further upstream and causing damage to the interior facility and injury or death to interior occupants." A447-48.

As Mr. Schloss explains, the back-blast damper in this case did not meet the NFPA standards because it was not manufactured to withstand the same anticipated pressures as the baghouse itself was. A448-49. The NFPA standards basically say that the ductwork and other materials connected to the baghouse should be as strong as the baghouse itself; otherwise a fire can start in the baghouse and be contained but then explode through the ductwork or damper. Here, the baghouse was constructed of 12 gauge steel but the back-blast damper was only constructed of 18 gauge steel. A450. Similarly, whereas the baghouse featured continuous welding at joints, the back-blast damper only utilized weaker spot welds. A449. Thus, even if the baghouse itself could have contained a combustion event, the weaknesses in the back-blast damper "would have allowed the fire to follow the initial pressure wave and travel upstream, into the building where it

could reach the interior of the plant." A449. **Accordingly, the construction and design of the back-blast damper also violated the NFPA industry standards.**

### c. The circumstances surrounding the fire that injured Hodges, Bonds, and Spangler.

In 2010, following the baghouse explosion at its facility in Italy, Federal-Mogul hired a company called LCM Corporation to inspect and, if necessary, clean out the dust removal system at its facility in Roanoke. Hodges, Bonds and Spangler worked for LCM. On December 30, 2010, they began their inspection and found that all of the ductwork was clean except the duct leading from the facility outside to the baghouse. This stretch of ductwork had three to five inches of aluminum dust built up. A4161.

The crew came back the next day – December 31st – to clean out the clogged duct. The duct was suspended in the air above the work floor and the machinery, so Hodges and Bonds were up on a scissor lift inside the facility with a vacuum hose trying to get the dust out. A2310. Meanwhile, Spangler was down on the floor walking towards a door to the outside of the building where the vacuum hose ran to their truck outside. A2674. Hodges testified that, as he used a flashlight to look inside the duct toward the building wall, he could see to the back-blast damper **and beyond** because the accumulated dust had caused the flap to be partially propped open. A2312. Beyond the damper he could see down the duct until it bent outside of the facility. A2312-13.

8

Hodges's testimony on this point and what happened next is essential to this appeal, so it is reproduced at length below, with apologies in advance for the extended block quoting:

> There was a damper or backlash or whatever they come up with for the name of this thing. That was in the pipe and it was open because of the material that was in the pipe holding it open. I could see past that and into a curve in the pipe which went into the baghouse.
>
> I was standing there and at that time, from that end, **from the baghouse end and past the damper**, there was a flash of a fireball and the next thing I know I'm on fire.
> . . .
>
> The damper was pretty much – it wasn't all the way flat open, but it was open enough that I could see past it.
> . . .
>
> It was a flash and the fireball hit me. It was just that fast. **I know that it did come from the far end, which would be at the baghouse there at the bend in the pipe past the flapper, damper or whatever it's called**.

A2312-13. (emphasis added). And to punctuate the matter with certainty, when asked whether he was "clear in [his] mind that there was some fire that came from beyond this damper apparatus," Hodges responded "**Yes, absolutely**." A2347. (emphasis added).

When asked about his recollection of the configuration of the damper, Hodges testified as follows:

Q:      Was it a flap with a hinge at the top?

9

> A:    I don't know.  I know that I could see the flapper that was in
>       there and to me it looked like it pivoted from the center, but I
>       don't know.
> Q:    That's what I'm trying to find.  Where you saw that could you
>       see a gap on the side, the top, or the bottom?
> A:    I could see over the top of it from the center up.

A2373.  It turns out that Hodges's recollection of the exact configuration of the

damper at this point in his deposition was incorrect.  The damper hinged at the top,

not the center.  A3650.  And indeed, later in his deposition Hodges stated "I don't

know for sure if it was the top or the side, but . . . it hinged somewhere inside the

pipe."  A2391.  So Hodges's recollection of the way the damper was hinged can

best be described as uncertain.    Nevertheless, he never wavered from the

proposition that he distinctly recalls seeing the flame coming at him from beyond

the back-blast damper, *i.e.* from outside of the building.

The fire hit Hodges and Bonds, who were standing side by side elevated on

the scissor lift.  At the same time, Spangler was on the ground walking towards an

outside door at the rear wall of the facility.[3]  The door was partially propped open

because aluminum duct attached to the hose from the vacuum that Hodges and

Bonds were using was running through the door to the truck outside.  A2676; *see*

*also* A4011, 4017 (photos of door propped open by duct).  Spangler testified that

as he was walking towards the door, he saw a very bright flash of light from in

---

[3] A helpful graphic representation of the facility and where certain people were
located can be found at A4006.

front of him, *i.e.* from the outside, and felt a concussive blast in his face from in

front of him, *i.e.* coming through the propped-open door, that knocked him back:

> So when I turned around is when the explosion occurred.   I was
> walking toward the door, almost at the door.
> . . .
>
> I heard one explosion.  Well, the first one – it all happened so fast – it
> was the bright white light just came at me from the front and blasted
> me pretty good and I don't know if I lost consciousness or not . . .
> . . .
>
> I was facing the door getting ready to go out the door.  It was propped
> by the six-inch aluminum hose that we use to vacuum was coming
> through the bottom of the door.

A2674-76.

To the right of the scissor lift there was another door leading outside.  This

door was monitored by a video camera located inside the facility.  *See* A4006

(indicating location of camera).  The door had panes that allowed light in from the

outside.  Thus, although this camera did not capture Hodges and Bonds on the

scissor lift or Spangler as he approached his door, it did face in generally the same

direction as Spangler was facing as he was walking towards his door and as

Hodges would have been looking as he looked down the duct work.

In opposition to the summary judgment motions, the Plaintiffs offered a

series of slides that are essentially a frame-by-frame of the video from the time of

the explosion.  At 9:31:08:50, the video shows light coming through the panes on

the door on the right of the frame, and then indoor factory lighting on the left of the

11

frame. At 9:31:08:708, there is essentially a white-out on the right of the frame where the door leads outside, but the left side of the frame is still partially visible. Then, at 9:31:09:109, the bright white light on the right of the frame looking outside dissipates and the light on the left of the frame, *i.e.* the inside of the building, intensifies. A4018-21.

As a result of this event, the baghouse was blown to kingdom come. A4010, 4012-14 (photos of baghouse after explosion). Hodges, Bond, and Spangler were each seriously burned by the fire, with medical bills in the hundreds of thousands of dollars, permanent disfigurement, and lifelong impairment. The Plaintiffs contended in the district court that the fire started outside of the building. They relied upon Hodges's unequivocal testimony that he saw the fire coming at him from outside the building beyond the back-blast damper. They also relied on the video, Spangler's testimony, and the physical evidence, all of which suggests that the first combustion event happened outside of the building and then moved inside, which corroborates Hodges's testimony. From this basis, they contended that the sub-standard design and construction of the back-blast damper and the vents on the baghouse failed to contain a baghouse fire and were thus a proximate cause of their injuries. *E.g.*, A446-50. The defendants, on the other hand, contended that the fire did not start outside of the building, but instead started inside of the building in the

12

ductwork because the Plaintiffs were not using a grounded vacuum and thus creating static electricity.  A4162.

## SUMMARY OF ARGUMENT

The key question in this case is where the fire started.  If it started outside of the building, the Plaintiffs can proceed with their theory that the substandard back-blast damper and venting failed to keep the fire outside and, thus, the defendants are responsible.  If it started inside, then the Plaintiffs lose.

Instead of merely determining whether the Plaintiffs had produced evidence that the fire originated outside of the facility, the district court improperly weighed that evidence, usurping the role of the jury.  Specifically, the district court focused on an inaccuracy in Hodges's testimony—that he recalled the damper opening from the middle—to conclude that it was therefore impossible for Hodges to have seen the fire coming from beyond the back-blast damper.  Having found Hodges's testimony not credible, the court went on to dismiss Spangler's testimony and the video evidence because neither was "conclusive" of where the fire started, regardless of whether they were nevertheless corroborative of Hodges's testimony.

The district court's decision on this point was error.  This Court has repeatedly held that eyewitness testimony is admissible and sufficient to sustain a party's burden even if it contains inaccuracies or is subject to cross examination as long as the inaccuracy is not the "heart" of the testimony.  Here, whether the

13

damper hinged at the top or the middle was not the heart of Hodges's testimony. That he saw a ball of flame racing towards him from beyond the damper was the heart of his testimony. Moreover, the inaccuracy does not render Hodges's testimony physically impossible. Regardless of where the hinge was or how the flap opened, there is no dispute as to the fact that three to five inches of aluminum dust was in the pipe and had propped the flap open. Where there is an opening—no matter where it is—there is the ability to see beyond. That is what matters here.

Moreover, the court improperly assessed Spangler's testimony and the video evidence on a conclusiveness standard. Conclusiveness is not the test. The test is whether the evidence corroborates other evidence such that, taken as a whole, the jury could find for the Plaintiffs on the fact in question—where the fire started. The district court's summary judgment decision should be reversed and the case remanded for trial.

## <u>ARGUMENT</u>

### 1.    Standard of Review

This Court reviews the district court's summary judgment ruling *de novo*, subject to well-settled standards. *PBM Prods., LLC v. Mead Johnson & Co*., 639 F.3d 111, 119 (4th Cir.2011). The Court must view the evidence in the light most favorable to the nonmoving party, here, the Appellants. *Id.* Of paramount importance to this appeal is that on summary judgment, the nonmoving parties'

14

burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (stating that it is improper at the summary judgment stage to weigh the evidence). In other words, the nonmoving party need only produce evidence on the fact in question, and the credibility or weight of that evidence is absolutely not of any concern on summary judgment. Once the nonmoving party has met its burden of production, the case gets past summary judgment and it is up to the fact finder to determine whether the evidence is persuasive.

**2.      The District Court inappropriately rejected Hodges's testimony.**

Hodges testified that he saw the fire coming at him from beyond the back-blast damper outside of the building. His is quintessential eyewitness testimony, and on the key point of whether the fire came from inside or outside of the facility his testimony is unequivocal. Of course, eyewitness testimony is often pocked with inaccuracies or inconsistencies, but that does not diminish its admissibility or ability to satisfy a burden. *See, e.g.*, *Thompson v. Hall*, 883 F.2d 70 (Table) (4th Cir. 1989) ("[E]yewitness testimony, universally recognized as legally sufficient, cannot be said to be 100% reliable.") Thus, this Court has sensibly held that inaccuracies or inconsistencies in eyewitness testimony are simply a question of credibility and weight when those inconsistencies do not go to the "heart" of the

15

testimony.  *See, e.g.*, *N.L.R.B. v. Hartley Oil Co., Inc.*, 210 F.3d 361 (Table) (4th. Cir. 2000).

The key question in this case is whether the fire came from outside of the building or inside.  Thus, the "heart" of Hodges's testimony is that he was able to look beyond the back-blast damper to see the fire coming at him from the bend in the duct outside of the building.  To be sure, Hodges was uncertain when asked about the configuration of the damper itself.  He testified that he thought that the flap pivoted from the center, but that he "didn't know," and that he could see over the top of it.  This situation is not at all uncommon when dealing with eyewitness testimony of a traumatic event.  Eyewitnesses to robberies and murders get seemingly clear details wrong all the time—the color of the assailant's clothes, what the assailant said, etc.—because those details are not what they were focused on at the time of the event.  They were focused on the gun or the knife in the assailant's hand.  Those inconsistencies or inaccuracies are perfect fodder for cross examination, but they do not render the testimony incredible as a matter of law.

In Mr. Hodges's situation, he was at the facility on December 31st to clean out the dust that was accumulated in the ductwork, not to repair or do anything to the back-blast damper.  So, when he was peering down the duct with his flashlight, his focus was on the accumulated dust as far as he could see.  When Mr. Hodges was looking down that duct, he did not care exactly how it was that he was able to

16

see the dust extending to the bend in the duct or, eventually, the ball of fire coming his way. He did not care how some damper was configured. All he cared about was the dust and then the ball of fire. His inability to accurately recall tangential details about how a damper was hinged is understandable because that was not his focus. He can be cross examined on this, but it does not render his testimony on the central fact of the fire incredible or impossible as a matter of law.

To justify its decision to disregard Hodges's testimony, the district court relied on a case from the Eleventh Circuit for the proposition that testimony can simply be ignored on summary judgment when "it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not possibly have been observed or events that are contrary to the laws of nature." A4186 (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). This may be a correct statement of the law, but it does not fit here. If the point of Hodges's testimony were to prove that the damper was hinged in the middle, then his testimony might be "blatantly contradicted by the record." But that is not the point of his testimony. The point of his testimony is to prove that the fire came from beyond the damper outside of the building, and there is nothing in the record to blatantly contradict that point.

Thus, we are left to consider whether his testimony "relates to facts that could not possibly have been observed or events that are contrary to the laws of

17

nature." And of course, Hodges's testimony does neither. He was standing on the scissor lift with a flashlight looking down the duct, where several inches of accumulated aluminum dust had propped the flap open. Thus, he was certainly in a position where it was possible for him to observe the fire coming from around the bend outside the facility and towards him. Moreover, fire coming "upstream" from the baghouse into the building is certainly not contrary to the laws of nature. Indeed, that is the whole reason the NFPA standards call for a back-blast damper. Thus, even accepting the *Feliciano* formulation for when a court may simply disregard testimony or evidence on summary judgment, it was not proper for the district court to do so here with Hodges's testimony.

**3. The district court improperly rejected the evidence corroborating Hodges's testimony.**

Hodges's testimony was buttressed by Spangler's testimony, the video evidence, and the physical evidence. After it rejected Hodges's testimony, the district court looked at Spangler's testimony and the video evidence. It rejected this evidence because it found the evidence "inconclusive" on the question of where the fire started. A4187. But the question was not whether either piece of evidence was conclusive of the fact in question. Indeed, it is rare that a single piece of evidence will ever be "conclusive" of a certain factual question. Instead, it is usually the case that various pieces of evidence cumulatively will allow the fact finder to conclude that a certain fact is or is not supported.

18

Here, it is absolutely true that neither Spangler's testimony nor the video are conclusive of where the fire originated. But the fact remains that Spangler testified that the first thing he saw and felt came from in front of him, *i.e.* outside of the building, not from beside him or behind him inside the building. Similarly, the video shows that the first noticeable event came from outside of the building, not inside. When taken together, a reasonable jury could certainly conclude that this evidence is corroborative of Hodges's testimony. When Hodges testifies that he saw the fire coming from outside the building, a reasonable juror could conclude that two other pieces of evidence suggesting that the first combustive event occurred outside of the building lend weight to Hodges's testimony and carry the burden on this question of fact.

**4.    The district court's decision contravenes this Court's precedent on eyewitness testimony.**

Hodges's testimony is strikingly similar to the testimony at issue in *Minyard Enters. Inc. v. Se. Chem. & Solvent Co.*, 184 F.3d 373, 381 (4th Cir. 1999). *Minyard* was a CERCLA case, and the question was whether a certain party— Southeastern—was responsible for puncturing a tank at a car dealership releasing a toxic substance into the environment. The magistrate judge, sitting as the trier of fact, found that Southeastern was responsible based primarily upon the testimony of an eyewitness, Broome. *Id.* at 380. Broome testified that he was working at the dealership on a Saturday when he saw the Southeastern crew digging a hole beside

19

the tank with a backhoe. He further testified that, as this was happening, he heard one of the Southeastern crew members yell "you busted it" and that he saw a foul smelling sludge start to escape from the tank. *Id.* at 381. A Southeastern employee partially corroborated Broome's testimony by agreeing that Southeastern usually removed underground storage tanks by using a backhoe to dig a hole beside the tank and then lifting the tank out using chains. *Id.*

On appeal to this Court, Southeastern contended that the magistrate judge improperly credited Broome's testimony due to some serious inconsistencies in his testimony. Specifically, other evidence established that Broome was actually working at a different site on the day Southeastern had allegedly removed and punctured the tank. *Id.* Moreover, the magistrate judge found that Southeastern removed the tank on a Tuesday, but Broome testified that he saw them removing the tank on a Saturday. *Id.* Thus, according to Southeastern, it was simply impossible for Broome to have observed what he testified to having observed.

No matter, said this Court. "The evidence relied upon by Southeastern to undermine Broome's testimony does not compel the conclusion that the magistrate judge clearly erred in crediting the **heart** of Broome's testimony (his witnessing Southeastern rupture the underground storage tank at issue)." *Id.* (emphasis added). This Court observed that these inconsistencies and inaccuracies, even though they related to the same general subject matter as his testimony about what

20

he saw, heard, and smelled, "did not require the magistrate judge to reject the heart of Broome's testimony." *Id.* This Court thus upheld the magistrate judge's finding. *Id.*

Simply stated, if Broome's eyewitness testimony was sufficient to sustain a judgment against Southeastern, then Hodges's testimony here is more than adequate to place the question of where the fire started before a jury. Just like Broome's testimony, Hodges's testimony contains some inconsistencies that open him up to cross examination. But in neither instance do the inconsistencies go to the heart of the testimony. Broome said he saw the Southeastern crew digging beside the tank, that he heard someone yell "you busted it," and that he saw and smelled a foul sludge. That was the heart of his testimony, just as the heart of Hodges's testimony is that the fire came from outside of the building. No amount of tangential inconsistencies can change the fact that Hodges testified unequivocally that he was positive that the fire came from outside of the building. Moreover, just like Broome's testimony, Hodges's testimony is supported by other evidence that tends to corroborate it, at least in part. The district court went too far when it found Hodges's testimony implausible as a matter of law.

## 5. The district court exceeded its authority in granting summary judgment.

It is clear from its Opinion that the district court just does not believe the Plaintiffs' evidence. The district court is perfectly entitled to that opinion, and if

21

this appeal followed a bench trial the Appellants would not have a leg to stand on.

But summary judgment simply is not a proper vehicle for the district court to

express its appraisal of the Plaintiffs' case. As this Court observed some time ago,

> One might argue that [Plaintiffs'] case is so unbelievable, it cannot be true and no reasonable jury could return a verdict in his favor. . . . But Rule 56(c) of the Federal Rules of Civil Procedure and *Anderson v. Liberty Lobby* provide no room for us to affirm the district court's grant of summary judgment. . . . It is not our job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe. Those tasks are for the jury. . . . Whether or not [Plaintiffs'] testimony should be believed is a credibility determination that is not for us to make. Summary judgment in favor of the [Defendants] was improper.

*Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). Or, as this Court more recently

stated,

> It may likewise be the case that, when the record is further developed, Mann will find it difficult, and perhaps impossible, to prevail on his claims-to prove that he was confined and assaulted in the manner he alleges, that the force applied by Appellees was unjustified, and that they full well knew this. But where, as here, a prisoner has duly filed the necessary briefs, affidavits, and corroborative evidence to support his claims, such disputes of credibility are reserved for a fact finder . . . .

*Mann v. Failey*, __ F. App'x__, 2014 WL 3511878, at *7 (4th Cir. July 17, 2014).

So too here. It may very well be the case that a jury believes the Defendants'

theory of the fire's origin over the Plaintiffs'. Either way, it is the jury's decision,

not the court's. Where, as here, the Plaintiffs have produced admissible evidence

on a material question of fact, it is simply inappropriate to enter summary judgment for the Defendants.

## CONCLUSION

For the reasons set forth above, the Court should reverse the district court's summary judgment order and remand this case for further proceedings.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellants request oral argument in this case. This is not because this case presents any undeveloped or questionable principles of law. That a court may not engage in evidence weighing or credibility assessment on summary judgment is certainly not a novel proposition. But it is an important proposition. Indeed it is the key limiting principle in summary judgment doctrine, so Appellants request oral argument to provide their most vigorous possible defense of this proposition. Additionally, Appellants request oral argument because this case turns on physical representations and explanation, including demonstrative exhibits, which are better suited for face-to-face dialogue than paper.

Respectfully Submitted,

*/s/ E. Kyle McNew*

E. Kyle McNew
MICHIEHAMLETT, PLLC
500 Court Square, Suite 300
Charlottesville, Virginia 22902
T: (434) 951-7234

Peter Brent Brown
BROWN & JENNINGS PLC
30 Franklin Road, Suite 700
Roanoke, Virginia 24011
T: (540) 444-4010

Neal Stanley Johnson
JOHNSON LAW PLC
120 Day Avenue, SW, Suite 200
Roanoke, Virginia 24016
T: (540) 777-5297

*Counsel for Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 14-1333        **Caption:** Hodges, et al. v. Federal-Mogul Corp., et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]   this brief contains _____5,736_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]   this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]   this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 [*identify word processing program*] in Times New Roman,  14 point font [*identify font size and type style*]; **or**

   [ ]   this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) E. Kyle McNew _____

Attorney for Appellants _____

Dated: 9/12/2014 _____

# CERTIFICATE OF SERVICE

I certify that on ___9/12/2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Guy Herbert, III
James O'Keefe, IV
Daniel Sullivan
GENTRY, LOCKE, RAKES & MOORE
10 Franklin Road, SE, Suite 800
Roanoke, Virginia 24022
T: (540) 983-9349
Counsel for Federal-Mogul Corporation

Bevin R. Alexander, Jr.
James Lucy
Daniel Sullivan
FREEMAN, DUNN, ALEXANDER, GAY,
LUCY & COATES, P.C.
1045 Cottontown Road
Lynchburg, Virginia 24503
T: (434) 485-5126
Counsel for Q-Tech and Carrington

Donald Morris
LAW OFFICES OF ANTONY K. JONES
3957 Westerre Parkway, Suite 320
Richmond, Virginia 23233
T: (804) 934-2682
Counsel for Kirk & Blum and K&B Duct

David Hudgins
HUDGINS LAW FIRM
515 King Street, Suite 400
Alexandria, Virginia 22314
T: (703) 837-3206
Counsel for Dustex

___/s/ E. Kyle McNew___
Signature

___9/12/2014___
Date