RECORD NO. 14-1333

IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

JEFFREY S. HODGES; TOMMY LEE BONDS;
JOHN PAUL SPANGLER,

*Plaintiffs-Appellants,*

v.

FEDERAL-MOGUL CORPORATION; Q-TECH EQUIPMENT &
SERVICES OF THE CAROLINAS, L.L.C.; CARRINGTON
ENGINEERING SALES CO.; CARRINGTON ENGINEERING
SALES; DUSTEX CORPORATION; THE KIRK & BLUM
MANUFACTURING COMPANY; K&B DUCT,

*Defendants-Appellees,*

and

CARRINGTON ENGINEERING SALES COMPANY, LLC;
CECO ENVIRONMENTAL CORPORATION.,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT ROANOKE

## RESPONSE BRIEF OF APPELLEES

Guy M. Harbert III
James J. O'Keeffe, IV
GENTRY, LOCKE, RAKES
& MOORE LLP
Suite 800
10 Franklin Road, SE
Roanoke, VA 24011
(540) 983-9459
*Counsel for Appellee
Federal-Mogul
Corporation*

David Drake Hudgins
HUDGINS LAW FIRM
515 King Street, Suite 400
Alexandria, VA 22314
(703) 837-3206
*Counsel for Appellee
Dustex Corporation*

Donald Edward Morris
LAW OFFICES OF ANTONY K. JONES
3957 Westerre Parkway, Suite 320
Richmond, VA 23233
(804) 934-2682

*Counsel for Appellees
The Kirk & Blum Manufacturing
Company and K&B Duct*

Bevin Ray Alexander, Jr.
James Barrett Lucy
FREEMAN, DUNN, ALEXANDER,
GAY, LUCY & COATES, P.C.
1045 Cottontown Road
Lynchburg, VA 24503
(434) 485-5126

*Counsel for Appellees
Q-Tech Equipment & Services
of the Carolinas, L.L.C.
and Carrington Engineering
Sales Co.*

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. **14-1333**          Caption: Hodges, et al v. Federal Mogul Corp., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Dustex Corporation
(name of party/amicus)


who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ David D. Hudgins               Date:      4/11/14

Counsel for: Dustex Corporation

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ 4/11/14 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

served via mail:

served electronically:

Guy M. Harbert, III
Donald Edward Morris
Mr. Edward Kyle McNew

Bevin Ray Alexander, Jr.
Edward Scott Austin
Peter Brent Brown
Neal Stanley Johnson
James Barrett Lucy
Daniel Robert Sullivan

/s/ David D. Hudgins                          4/11/14
(signature)                                   (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1333__        Caption: __Jefferey S. Hodges v. Federal-Mogul Corporation, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Kirk and Blum Manufacturing Company;   K&B Duct__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?                            ☑ YES ☐ NO
     If yes, identify all parent corporations, including grandparent and great-grandparent
     corporations:
        CECO Group, Inc., CECO Environmental Corporation

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                               ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Donald E. Morris                    Date:    April 14, 2014

Counsel for: The Kirk and Blum Manufacturing Co

## CERTIFICATE OF SERVICE
***************************

I certify that on _____April 14, 2014_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

See Attached List

/s/ Donald E. Morris                                April 14, 2014
     (signature)                                           (date)

- 2 -

Mr. Bevin Ray Alexander, Jr.
FREEMAN, DUNN, ALEXANDER, YEATTS & TILLER, PC
1045 Cottontown Road
Lynchburg, VA 24503-0000

Mr. Edward Scott Austin
GENTRY, LOCKE, RAKES & MOORE
10 Franklin Road, SE
P. O. Box 40013
Roanoke, VA 24022-0013

Mr. Peter Brent Brown
BROWN & JENNINGS PLC
Suite 700
30 Franklin Road
Roanoke, VA 24011-2427

Mr. Neal Stanley Johnson
JOHNSON LAW PLC
Suite 200
120 Day Avenue, SW
Roanoke, VA 24016-4110

James Barrett Lucy
FREEMAN, DUNN, ALEXANDER, YEATTS & TILLER, PC
1045 Cottontown Road
Lynchburg, VA 24503-0000

Mr. Sean Charles Edward McDonough
HUDGINS LAW FIRM
Suite 400
515 King Street
Alexandria, VA 22314-0000

Daniel Robert Sullivan
GENTRY, LOCKE, RAKES & MOORE
10 Franklin Road, SE
P. O. Box 40013
Roanoke, VA 24022-0013

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1333__          Caption: Hodges, et als. v. Federal Mogul Corp., et als

Pursuant to FRAP 26.1 and Local Rule 26.1,

Q-Tech Equipment & Services of the Carolinas, L.L.C., Carrington Engineering Sales Co., and
(name of party/amicus)

Carrington Engineering Sales

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

10/28/2013 SCC                              - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                        ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: /S/ Bevin R. Alexander, Jr.                    Date:    15 April 2014

Counsel for: Q-Tech, etc., Carrington Eng'r, etc.

## CERTIFICATE OF SERVICE
****************************

I certify that on ____15 April 2014____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

By electronic mail:
Edward Kyle McNew, Esq., counsel for Plaintiffs
Guy M. Harbert, III, Esq.,counsel for Federal Mogul
Donald E. Morris, Esq., counsel for K&B parties
David D. Hudgins, Esq., counsel for Dustex

/S/ Bevin R. Alexander                          15 April 2014
    (signature)                                     (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _14-1333_    Caption: Jeffrey Hodges, et al. v. Federal-Mogul Corporation, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Federal-Mogul Corporation
(name of party/amicus)

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                 ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:
      See attachment.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                            ☑ YES ☐ NO
      If yes, identify all such owners:
      Federal-Mogul Corporation's stock is wholly owned by a publicly held corporation,
      Federal-Mogul Holdings Corporation.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☑YES ☐NO
If yes, identify entity and nature of interest:

Federal-Mogul Corporation's insurers have a direct financial interest in the outcome of this litigation. The Travelers Companies provide Commercial General Liability coverage and American International Group, Inc. provides a Commercial Liability Umbrella Policy.

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date:  April 23, 2014

Counsel for:  Federal-Mogul Corporation

## CERTIFICATE OF SERVICE
**************************

I certify that on _____ April 23, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
(signature)

April 23, 2014
(date)

- 2 -

2.    Federal-Mogul Corporation is a wholly owned subsidiary of Federal-Mogul Holdings Corporation. IEH FM Holdings, LLC owns 80.7% of the common stock of Federal-Mogul Holdings Corporation. American Entertainment Properties, in turn, owns 100% of IEH FM Holdings, LLC, and is itself indirectly owned by Icahn Enterprises Holdings LP. Icahn Enterprises LP owns 99% of Icahn Enterprises Holdings LP. Icahn Enterprises GP Inc. is the general partner of Icahn Enterprises Holdings LP and is wholly owned by Carl Icahn.

# Table of Contents

Table of Authorities ................................................................... v

Statement of the Issues .............................................................. 1

1. Even viewed in the light most favorable to the Plaintiffs, can their physically impossible and admittedly incorrect "eyewitness" testimony, coupled with inconclusive circumstantial evidence, create a genuine issue of material fact for the jury? ......................... 1

2. Without expert testimony on causation, can the Plaintiffs:

   a. Create a genuine issue of material fact as to whether the alleged defects in the Defendants' dust-collection system—inadequate baghouse venting and an insufficient back-blast damper— proximately caused their injuries? .................................................. 1

   b. Overcome the Defendants' theory of the case, which explains the eyewitness testimony and physical facts of the accident, and is supported by expert testimony? ......................................... 1

Statement of the Case .................................................................. 1

1. The Parties ............................................................................... 1

A. Defendant Federal-Mogul runs a factory in Blacksburg, Virginia that uses dust-collection system. Defendants Dustex, Carrington, and Kirk & Blum helped to design the system and/or provided components for it .................................................................. 1

B. The Plaintiffs are certified in hazardous waste material, and they work for a hazardous-waste-removal company ................................. 3

i

2.  To protect its employees, Federal-Mogul undertook a companywide aluminum-dust-remediation program ................................................. 3

3.  LCM's hazmat team, including Plaintiffs Bonds and Hodges, inspected Federal-Mogul's Blacksburg plant ..................................... 4

4.  The Plaintiffs returned the next day to collect the aluminum dust. None of them knew that the dust was explosive, or even what it was in the first place.................................................................. 5

A.  The Plaintiffs did not wear fire-protective equipment, even though it is available to them.................................................................. 5

B.  The Plaintiffs did not ground their vacuum truck or hose, even though they knew that their setup would generate enough static electricity to shock them through their protective equipment ........ 6

C.  The Plaintiffs duct-taped a PVC extension to their vacuum hose to increase their reach............................................................................ 7

5.  The duct and baghouse exploded ...................................................... 10

A.  Hodges claims that he saw over the damper, which is physically impossible .......................................................................... 11

B.  Spangler testified that he was hit by a blast from the direction of the baghouse .......................................................................... 13

C.  The video footage is inconclusive ...................................................... 14

6.  The Plaintiffs sued the Defendants, alleging that the damper and baghouse were defectively designed ................................................. 16

7. The District Court entered summary judgment in favor of the
Defendants ............................................................................... 17

Summary of Argument .......................................................... 22

Argument and Authorities ...................................................... 23

1. The standard of review is de novo ...................................... 23

2. The District Court correctly applied the summary-judgment
standard .................................................................................. 25

A. Hodges' physically impossible "eyewitness" testimony is not
enough to create a genuine issue of material fact ........................... 25

i. Under *Scott v. Harris*, 550 U.S. 372 (2007), the District Court did
not have to credit testimony that was blatantly contradicted by
the record ................................................................................. 25

ii. Hodges' testimony was blatantly contradicted by the record ....... 27

B. The Plaintiffs' other purportedly corroborating evidence is not
enough to create a question of fact for the jury ............................. 36

i. The District Court did not invent and apply a new "conclusiveness"
standard ................................................................................... 36

ii. Spangler's testimony will not help a reasonable jury determine
what caused either the explosion or the Plaintiffs' injuries ........... 37

iii. The video evidence will not help a reasonable jury determine
what caused either the explosion or the Plaintiffs' injuries ........... 38

C. The District Court did not make improper credibility
   determinations ................................................................. 39

3. As the District Court correctly observed, the Plaintiffs cannot
   exclude other potential causes of the explosion ............................ 40

4. Without expert testimony on causation, the Plaintiffs cannot
   prove that any alleged defect in the dust-collection system
   proximately caused their injuries ......................................... 45

Conclusion ................................................................. 48

Statement Regarding Oral Argument ........................................ 50

Certificate of Compliance with Rule 28.1(e) or 32(a) ...................... 51

Certificate of Service ................................................... 52

iv

# Table of Authorities

**Cases**

*Alevromagiros v. Hechinger Co.,*
993 F.2d 417 (4th Cir. 1993) ........................................................ 40

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................... 24

*Blue Ridge Services Corp. v. Saxon Shoes, Inc.,*
271 Va. 206, 624 S.E.2d 55 (2006) .............................................. 45

*Boyle v. United Technologies Corp.,*
792 F.2d 413 (4th Cir. 1986) ........................................................ 41

*Coble v. City of White House,*
634 F.3d 865 (6th Cir. 2011) ........................................................ 26

*Feliciano v. City of Miami Beach,*
707 F.3d 1244 (11th Cir. 2013) ............................................... 19, 27

*Jeld-Wen, Inc. v. Gamble,*
256 Va. 144, 501 S.E.2d 393 (1998) ............................................ 47

*Lawson v. Doe,*
239 Va. 477, 391 S.E.2d 333 (1990) ............................................ 40

*Logan v. Montgomery Ward & Co.,*
216 Va. 425, 219 S.E.2d 685 (1975) ....................................... 40, 44

*Marchant v. Boddie-Noell Enterprises, Inc.,*
344 F. Supp.2d 495 (W.D. Va. 2004) ........................................... 46

*Minyard Enterprises, Inc. v. Southeastern Chemical & Solvent Co.,*
184 F.3d 373 (4th Cir. 1999) .................................................................33-36

*N.L.R.B. v. Hartley Oil Co., Inc.,*
210 F.3d 361, 2000 U.S. App. LEXIS 5181 (4th Cir. 2000)...................... 33

*Richmond Med. Ctr. for Women v. Gilmore,*
224 F.3d 337 (4th Cir. 2000) ........................................................... 45

*Scott v. Harris,*
550 U.S. 372 (2007).................................................... 23, 25, 26, 27

*Stokes v. L. Geismar, S.A.,*
815 F. Supp. 904 (E.D. Va. 1993), *aff'd*, 16 F.3d 411 (4th Cir. 1994) ...... 41

*Thompson v. Hall,*
883 F.2d 70, 1989 U.S. App. LEXIS 22649 (4th Cir. 1989)...................... 32

*Tolan v. Cotton,*
134 S.Ct. 1861 (2014).................................................................. 50

*Toll Bros. v. Dryvit Sys.,*
432 F.3d 564 (4th Cir. 2005) ........................................................... 45

*Wilkins v. Montgomery,*
751 F.3d 214 (2014) ...................................................................... 24

*Williams v. Prof'l Transp., Inc.,*
294 F.3d 607 (4th Cir. 2002) ........................................................... 31

*Witt v. W. Va. State Police,*
633 F.3d 272 (4th Cir. 2011) .......................................................26-27

**Rules**

Fed. R. App. P. 28.1(e) ................................................................ 51

Fed. R. App. P. 32(a) .................................................................. 51

Fed. R. Civ. P. 56(a) ................................................................... 24

Fed. R. Evid. 702 ....................................................................... 17

## Statement of the Issues

The Plaintiffs' Statement of the Issues is more accurately restated as follows:

1. Even viewed in the light most favorable to the Plaintiffs, can their physically impossible and admittedly incorrect "eyewitness" testimony, coupled with inconclusive circumstantial evidence, create a genuine issue of material fact for the jury?

2. Without expert testimony on causation, can the Plaintiffs:

   a. Create a genuine issue of material fact as to whether the alleged defects in the Defendants' dust-collection system—inadequate baghouse venting and an insufficient back-blast damper—proximately caused their injuries?

   b. Overcome the Defendants' theory of the case, which explains the eyewitness testimony and physical facts of the accident, and is supported by expert testimony?

## Statement of the Case

**1.   The Parties**

**A.   Defendant Federal-Mogul runs a factory in Blacksburg, Virginia that uses a dust-collection system. Defendants Dustex, Carrington, and Kirk & Blum helped to design the system and/or provided components for it.**

Federal-Mogul owns a factory in Blacksburg, Virginia, where it produces automotive bearings. JA 629, 4160. The manufacturing process bonds aluminum to steel, creating combustible aluminum dust as a

1

byproduct. JA 631-32, 4160. To remove this potentially dangerous dust from the plant, Federal-Mogul worked with Carrington, a manufacturer's representative, to design[1] and install a dust-collection system. JA 1209-10, 4160-61. Carrington served as a liaison between Federal-Mogul and the two other defendants involved in this appeal, Dustex and Kirk & Blum. JA 1215-16, 1232-33, 4161.

The dust-collection system was installed in late 2003. JA 1222, 4161. It used fans and ductwork to capture the dust and transport it outside of the factory and into an exterior dust collector called a "baghouse." JA 1222, 4161. Dustex designed the baghouse. JA 1232, 4161. Inside the duct work, and just beyond the exterior wall of the factory, was a device called a "back-blast damper" designed by Kirk & Blum. JA 373, 1215, 4161. The Plaintiffs contend that the damper was intended to stop an explosion in the baghouse from spreading through the ductwork and into the plant. JA 29, 4161.[2]

---

[1] Carrington denies that it was involved in the design process. This dispute is immaterial to the issues on appeal.

[2] Kirk & Blum disagrees, but the dispute is not relevant to the issues on appeal.

**B.**    **The Plaintiffs are certified in hazardous waste removal, and they work for a hazardous-waste-removal company.**

Plaintiffs Jeffrey Hodges, Tommy Lee Bonds, and John Paul Spangler all worked for LCM Corporation, a hazardous-waste-removal company. JA 2284, 2463, 2644, 4161. The Plaintiffs were themselves trained and certified in hazardous waste removal. *E.g.*, JA 2395-2452 (Hodges' certifications), 2604-32 (Bonds' certifications), 4161. They had ample experience. Hodges had been certified as a hazardous materials technician since at least 1996, and Bonds since 2007 (although Bonds was certified as a hazardous waste worker as early as 1993). JA 2449, 2629, 2630.

**2.**    **To protect its employees, Federal-Mogul undertook a companywide aluminum-dust-remediation program.**

In July of 2009, an explosion ripped through a Federal-Mogul factory in Italy. JA 116, 265. Upon learning that the explosion was potentially caused by the buildup of aluminum dust, Federal-Mogul implemented a companywide dust mitigation program to prevent any further accidents. JA 116-17, 265. The Blacksburg factory hired Chilworth Technologies, a dust-mitigation consultant, to inspect its plant and provide recommendations. JA 117.

3

Chilworth, in turn, suggested that Federal-Mogul hire a hazardous materials removal expert to inspect all overhead ducts that might carry aluminum dust to the baghouse and conduct any necessary remediation. JA 117, 265. After investigating, Federal-Mogul hired LCM, a company that held itself out as an expert in removing hazardous materials from industrial settings, and whose work experience included vacuuming munitions from the Radford Arsenal. JA 117-18, 265-66.

### 3. LCM's hazmat team, including Plaintiffs Bonds and Hodges, inspected Federal-Mogul's Blacksburg plant.

LCM inspected the Blacksburg plant on December 30, 2010. JA 267. Its inspection team consisted of Plaintiffs Bonds and Hodges, and job supervisor Danny Collins; Plaintiff Spangler did not participate. JA 278, 305, 2321, 2493, 2652. The team determined that all of the plant's ducts were clean except one, which was nearly half full with a buildup of three to five inches of powdery dust. JA 267, 278-79.

**4.    The Plaintiffs returned the next day to collect the aluminum dust. None of them knew that the dust was explosive, or even what it was in the first place.**

**A.    The Plaintiffs did not wear fire-protective equipment, even though it was available to them.**

The Plaintiffs and Collins returned the next day—New Year's Eve—to clean out the duct. None of the Plaintiffs on the LCM hazmat team knew what material they were vacuuming. There is a factual dispute as to whether and when their supervisors at LCM knew that they were dealing with aluminum dust. *Compare* JA 267, 2656, 2701-02 *with* 3813-14. But even if the Plaintiffs had known, it may not have made a difference. Despite their training and certifications, none of the Plaintiffs knew that aluminum dust was combustible.[3] JA 512, 2159, 2331, 2523-24.

Thus, even though they had access to fire-resistant equipment, the Plaintiffs chose not to use it. JA 2212-13. Instead, they wore personal protective equipment including Tyvek suits, gloves, safety glasses, earplugs, hard hats, and respirators. JA 281, 302, 373, 2310-11, 2515.

---

[3] Plaintiff Spangler testified that after the hazmat team had started vacuuming, LCM supervisor Collins told him that they were cleaning "aluminum and debris or something like that." JA 2656, 2701. Spangler did not ask Collins about any risks associated with aluminum because he assumed that Collins would have told him if the material was dangerous. JA 2657, 2701-02.

The Plaintiffs' Tyvek suits were flammable. JA 302, 367, 512, 2121-22, 2163, 2515.

**B.    The Plaintiffs did not ground their vacuum truck or vacuum hose, even though they knew that their setup could generate enough static electricity to shock them through their protective equipment.**

The Plaintiffs parked a vacuum truck outside and ran a hose from the truck into the plant. JA 282, 293, 301. The Plaintiffs knew from prior experience that this setup could create static electricity that would shock the operators holding the vacuum hose. JA 283, 300, 2322-23, 2332, 2571-72, 2580-81, 2723-25. LCM employees would sometimes reduce the RPMs on the vacuum truck to mitigate the static electricity they generated. JA 283-84, 297-98, 300, 2161-62, 2323.

Both Bonds and Hodges were shocked by static electricity during the Federal-Mogul job. JA 2330, 2556, 2581-82. Sparks of static electricity were actually shooting off of their equipment. JA 396, 509, 3857-58 (counsel's representation that Hodges would testify at trial that there were "sparks coming off" of his equipment; *but see* JA 374 (Hodges' deposition testimony that he did not see any sparks).

Even so, the Plaintiffs did not ground the vacuum truck or the hose that they were using to clean the duct. JA 2327-28.

## C.  The Plaintiffs duct-taped a PVC extension to their vacuum hose to increase their reach.

Because the duct was about 20 or 30 feet above the ground, Bonds and Hodges entered a scissors lift to reach it. JA 301, 396, 2310, 2512. They cleaned one section of the duct, removed it and placed it on the ground, and continued vacuuming in the direction away from the baghouse. JA 301, 2311, 2328-29, 2387, 2512, 2542. When they had completed that side of the duct, they turned around and began working back toward the baghouse. JA 396, 2387, 2512, 2542.

Bonds and Hodges began to have difficulty with the hose, which was getting stuck and not pushing far enough into the duct. JA 373, 2311, 2541. They asked a Federal-Mogul employee for a PVC extension, which they then duct-taped to their vacuum hose to lengthen and stabilize it. JA 267, 301, 373, 2311, 2512-13, 2558-59. They continued to work using this improvised apparatus.

Hodges asked Spangler to reduce the RPMs on the vacuum truck to moderate the amount of static electricity that the hazmat team was

generating. JA 367, 382, 2674, 2693-94. Spangler turned and started walking

to an exterior door. JA 367, 382, 2674, 2695.

The diagram included as JA 4006 provides a useful overview of the

Plaintiffs' positioning at this point in time:[4]

---

[4] While this diagram contains some immaterial mistakes (for example, the duct to the baghouse turns 90 degrees to the right, not the left), the Plaintiffs agree that it provides "[a] helpful graphic representation of the facility and where certain people where located." Br. 10 n.3.



**5.     The duct and baghouse exploded.**

Hodges stood on the scissors lift, holding the hose and PVC extension in his right hand. JA 2311. He was about 40 feet from the exterior wall, leaning on the duct, and he held a flashlight in his left hand. JA 373, 2312, 2328; *but see* JA 2555 (Plaintiffs were 20 feet from exterior wall). With his flashlight, he could see three to five inches of dust covering the length of the duct. JA 2320. The dust varied in depth throughout the duct. JA 2312.

Hodges testified that he could see the damper, which was being propped open by dust, and that he watched a fireball come down the duct from beyond the damper and set him on fire:

> There was a damper or backsplash or whatever they come up with for the name of this thing. That was in the pipe and it was open because of the material that was in the pipe holding it open. I could see past that and into a curve in the pipe which went into the baghouse.

> I was standing there and at that time, from that end, from the baghouse end and past the damper, there was a flash of a fireball and the next thing I know I'm on fire.

JA 2312; *see also* JA 2347 (Hodges' testimony that he is "absolutely" clear that fire came from beyond the damper).

10

All three Plaintiffs were injured in the fire, and the baghouse

exploded. The Virginia Department of Labor and Industry cited LCM for a

"serious" violation. JA 388.

## A.    Hodges claims that he saw over the damper, which is physically impossible.

The Plaintiffs focus on three pieces of evidence, each of which merits

careful review. The first is Hodges' testimony. In his deposition, Hodges

was asked repeatedly about how he was able to see past the damper. First,

he explained that it was propped open:

> Q    How could you see from beyond?
>
> A    The damper was pretty much—it wasn't all the way flat open, but it was open enough that I could see past it.
>
> Q    So, you just saw light emanating from beyond it?
>
> A    It was a flash and the fireball hit me. It was just that fast. I know that it did come from the far end, which would be at the baghouse there at the bend in the pipe past the flapper, damper or whatever it's called.

JA 2313. In their brief, the Plaintiffs focus on this testimony. Br. 9.

Hodges later clarified this story, however, specifying that he could

see over the top of the backdraft damper:

Q       You testified before that it appeared to you that the flap was open a little bit because of the dust that was in the duct, correct?

A       Correct.

Q       How could you tell that from where you were?

A       I could see it.

Q       Can you describe the dust that was at the end of the pipe? Was it thicker than where you were?

A       To me the dust looked like it was 4 to 5 inches deep there where that damper or whatever it's called was at. So, it would have been open that far.

Q       When you say "open that far", can you describe that?

A       4 to 5 inches. It would have been laying on the dust which held it open.

Q       Was it a flap with a hinge at the top?

A       I don't know. I know that I could see the flapper that was in there and to me it looked like it pivoted from the center, but I don't know.

Q       That's what I'm trying to find out. Where you saw that could you see a gap on the side, the top or the bottom?

A       *I could see over the top of it from the center up.*

Q       Anything else that you remember about what you saw when you looked in the duct?

A       No.

JA 2372-73 (emphasis added). To be sure, Hodges hedged his testimony about the flap's hinge: "It hinged. I don't know for sure if it was the top or the side, but it was a—I even made the statement that it looked like a damper to me. It hinged somewhere inside the pipe." JA 2391. He testified that the flap was "pretty far open." JA 2391.

Although Hodges equivocated on precisely where the damper was hinged, he unequivocally testified that he could see "over the top of [the damper] from the center up." JA 2373. All of the parties agree that this is impossible. It is undisputed that the backdraft damper hinges at the top. *E.g.*, Br. 10. There is no way that Hodges could have seen over it.

## B.    Spangler testified that he was hit by a blast from the direction of the baghouse.

The Plaintiffs also focus on Spangler's testimony. At the time of the explosion, Spangler was leaving the plant to adjust the settings on the vacuum truck. He was still in the plant but almost to the door, facing the general direction of the exterior baghouse. JA 2674, 2695, 2729-32, 4006. The door was partially propped open by the hose that Hodges and Bonds had run to the duct from the vacuum truck outside. JA 2676. Spangler testified that he heard one explosion, and was "blasted . . . pretty good" from the

13

front by bright white light and a concussive pulse. JA 2675. The explosion burned his face, but not the back of his head. JA 2730. Spangler signed a witness statement in which he said that he did not know "if flash was from inside or outside. But was blown back into building and not out of building." JA 362.

## C.    The video footage is inconclusive.

Finally, the Plaintiffs focus on video shot by a camera inside the plant. The camera was located a significant distance from both the Plaintiffs and the baghouse, and did not have a direct line of sight to either location. JA 514, 557-58, 4006, 4181. It was pointed at a door that opened to a vestibule; the door did not lead directly outside. JA 514-17, 4181. The video shows a bright flash of white light followed by a series of people entering and leaving the building. JA 4181.

Both parties submitted frame-by-frame analyses of the footage from the camera in support of their positions. The Defendants pointed out that (1) at the time of the bright flash, the door to the vestibule becomes totally reflective and momentarily blocks the camera's view into the vestibule; (2) during the flash, shadows of objects near the door fall away from the area

where the Plaintiffs were working, suggesting that the flash emanated from the Plaintiffs' location inside the plant; (3) the door pulses open from a pressure wave from inside the plant, which is inconsistent with a pressure pulse originating outside the plant in the baghouse; (4) shortly after the inner door pulses open and closed again, the video shows broken glass from the outer door being scattered into the vestibule as the outer door breaks; (5) the camera was positioned a significant distance from the Plaintiffs and did not have a direct line of sight to either them or the baghouse; and (6) when the contrast is altered, the door remains visible while most of the inside of the plant is saturated. JA 514-15, 558-59. These facts suggest that the video shows an explosion inside the plant.

For their part, the Plaintiffs argue that (1) at 9:31:08:50, the video shows light coming through the panes on the door on the right of the frame, and indoor factory lighting on the left of the frame; (2) at 9:31:08:708, the right side of the frame is whited out, but the left side remains partially visible; and (3) at 9:31:09:109, the white light on the right of the frame dissipates and the light on the left of the frame intensifies. Br. 11-12 (citing

JA 4018-21). These facts suggest that the video shows an explosion outside the plant.

### 6. The Plaintiffs sued the Defendants, alleging that the damper and baghouse were defectively designed.

The Plaintiffs sued, contending that the fire began in the exterior baghouse, moved past the damper, and continued into the ductwork where it burned them. JA 29. The Plaintiffs identified two experts, Martin Schloss and Patrick McGinley, who opined that the explosion originated in the baghouse and that the explosion was caused by an exothermic reaction resulting from the interaction of aluminum dust and condensation. JA 414-15, 458-60, 4162. It is fair to characterize this causation theory as spontaneous combustion. *See* JA 3141 (McGinley referring to an exothermic reaction as "spontaneous combustion"). The Plaintiffs argued that the baghouse was inadequately vented, and that the damper wasn't built to be as strong as the baghouse. JA 414-15, 445-50; Br. 6-7.

The Defendants disagreed. They noted that the Plaintiffs were vacuuming highly combustible aluminum dust with an ungrounded industrial vacuum, to which they had duct-taped a PVC extension. The resultant static electricity was the obvious ignition source, sparking a flame

that shot both ways through the ductwork—out to the baghouse, where it triggered an explosion, and into the plant, where it burned the Plaintiffs and ignited their Tyvek suits.

**7.  The District Court entered summary judgment in favor of the Defendants.**

After discovery, the Defendants asked the District Court to exclude the Plaintiffs' cause-and-origin experts and to enter summary judgment in their favor. The parties briefed the issues in depth, and the District Court heard lengthy oral arguments on January 24, 2014, and February 7, 2014. JA 3818-3968, 4028-4157.

A month later, in a carefully reasoned, 34-page opinion, the District Court granted the Defendants' motions. JA 4160, 4194. It first outlined the material facts of the case, stated in the light most favorable to the Plaintiffs. JA 4160-63. The District Court then analyzed the Plaintiffs' expert testimony and excluded it under Federal Rule of Evidence 702 and the governing case law. JA 4163-85. The Plaintiffs have not challenged this ruling.

Next, the District Court accurately recited the summary-judgment standard. JA 4184-85. It correctly observed that, to prove their claims, the

17

Plaintiffs had to show that their injuries resulted from either the baghouse's failure to properly vent the explosion or the damper's failure to contain it. JA 4185. As such, they could have no claim unless they were able to prove that the fire originated on the far side of the damper. JA 4185. The District Court then individually analyzed each of the four pieces of evidence that, according to the Plaintiffs, could create "a colorable issue of fact for a jury: (1) the testimony of Hodges[,] (2) the testimony of another plaintiff, John Paul Spangler, (3) the video footage from the security camera, and (4) the lack of deformity in the ductwork post-ignition." JA 4185-86.

The District Court first dealt with Hodges. In its earlier treatment of the Plaintiffs' expert witnesses, the District Court had already recited the key portions of Hodges' testimony. JA 4178-79. Turning to summary judgment, the District Court correctly observed that "Hodges' testimony that he saw over the top of the damper is impossible. There is no dispute of fact as to the configuration of the damper, which was hinged at the top." JA 4186. Thus, Hodges was clearly mistaken when he testified that he saw over the top of the damper, and his physically impossible testimony could

18

not create an issue of fact for the jury. JA 4186. Citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013), the District Court pointed out that it is proper to discount a plaintiff's testimony at summary judgment when it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law—that is, when it relates to facts that could not possibly have been observed or events that are contrary to the laws of nature. It concluded that Hodges' testimony about events that he could not have possibly seen would not let a reasonable jury do anything but speculate about the source of the explosion. JA 4186.

In the earlier portion of its ruling concerning expert testimony, the District Court had considered both Hodges' admission that he was unsure how the damper hinged and his insistence that he had seen past the damper. JA 4179. Neither factor changed the analysis. As the District Court explained, whatever Hodges saw, he saw it over the damper from the center up. JA 4179. To conclude that Hodges had somehow seen past the damper would have required the court to ignore the device's undisputed configuration. JA 4179. The District Court also noted that McGinley had "labored at length to explain how Hodges could have nonetheless seen

past the damper," suggesting that the dust in the framework had accumulated more on one side of the duct than the other in an "'EKG'-like pattern . . . thus allowing the non-translucent dust to prop open the damper while simultaneously allowing Hodges to see past it." JA 4179-80. But as the trial court correctly observed, Hodges testified that he saw over—not to the side of, and not under—the damper. "Thus, McGinley's creative hypothesis [was] not consistent with Hodges' testimony." JA 4180.

Second, the District Court addressed Spangler's testimony. As it had done with Hodges, the court accurately recited the key portions of Spangler's deposition testimony. JA 4186-87. It nonetheless concluded that Spangler's testimony could not remedy the fatal flaw in the Plaintiffs' case. JA 4187. While Spangler described a flash of white light and a disorienting explosion, his testimony could not provide a source for the ignition of the fire and explosion. JA 4187. That's because it was undisputed that the Plaintiffs were burned inside the plant by fire from the ductwork and that the exterior baghouse exploded. JA 4187.

As a result, the District Court concluded that "Spangler's testimony does nothing to assist the jury in deciding whether the claimed defects in

the baghouse and damper played any role in the injuries he and his co-workers sustained." JA 4187. It observed that, in this respect, "Spangler's testimony is just as inconclusive as the video footage and provides no clue as to how and where the fire and explosion began and, critically, whether the claimed defects of the damper and baghouse caused plaintiffs' injuries." JA 4187.

Third, the District Court dealt with the video. It correctly pointed out that the video does not show the baghouse, the ductwork, or the plaintiffs. Thus, as with Spangler's testimony, it doesn't give the jury any way to determine "the ignition of the fire and explosion from watching the video except by conjecture, guess, or random judgment." JA 4188.

Finally, the District Court took up the Plaintiffs' claim that the jurors could view the ductwork themselves and determine that the fire did not begin there. The District Court noted that McGinley's excluded opinion had not provided a reliable foundation for that conclusion, and held that allowing lay jurors to reach the same result without expert testimony would invite "utter speculation." JA 4188.

The District Court held that, without reliable expert testimony, the Plaintiffs had not forecast enough evidence to let a reasonable jury conclude that the ignition of the aluminum dust took place in the baghouse and that the damper and/or baghouse had failed to protect them. JA 4188. "At most, plaintiffs' evidence, taken together and viewed in the light most favorable to them, leaves the jury completely out to sea as to cause and origin of the fire and explosion in this case." JA 4188. The District Court determined that the Plaintiffs had built a case showing an unexplained accident that may have been attributable to several causes, and the Defendants were not responsible for all of those causes. It held that, under long-standing Virginia law, the Plaintiffs therefore could not recover. JA 4188-89.

The Plaintiffs now appeal.

## Summary of Argument

The District Court appropriately entered summary judgment in the Defendants' favor because the Plaintiffs failed to establish any genuine dispute of material fact. Once the District Court had excluded their experts, they had no way to establish the cause or origin of the explosion, let alone

show that any alleged defect in the dust-collection system proximately caused their injuries. The evidence that the Plaintiffs now try to marshal in support of their case is not enough to get them to the jury. The centerpiece of their appeal, Hodges' testimony, is physically impossible and blatantly contradicted by the record. The District Court was not required to accept such "visible fiction" at the summary-judgment stage. *Scott v. Harris*, 550 U.S. 372, 381 (2007). The Plaintiffs' various efforts to rehabilitate Hodge's testimony fall flat. The core of his testimony is that he saw over and past the damper to watch an explosion burst forth from the baghouse. No reasonable fact finder could be expected to look past the first part of his statement, which is admittedly impossible, to credit the second.

The Plaintiffs' remaining pieces of evidence lack probative value. Even if a jury believed them and drew all reasonable inferences in the Plaintiffs' favor, Spangler's testimony and the video are consistent with both parties' accounts of the accident. At best, they establish that the baghouse exploded—a fact that nobody disputes. They would not let a reasonable jury determine the cause or origin of the explosion, much less the proximate cause of the Plaintiffs' injuries.

## Argument and Authorities

**1.    The standard of review is de novo.**

This Court will review the District Court's grant of summary

judgment de novo, applying the same standard as the lower court. *Wilkins*

*v. Montgomery*, 751 F.3d 214, 220 (2014). Summary judgment is appropriate

when a party "shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).

In applying this rule, "the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986) (emphasis in original). Materiality is defined by the

applicable substantive law. "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the

entry of summary judgment. Factual disputes that are irrelevant or

unnecessary will not be counted." *Id*. at 248.

Determining whether a dispute is "genuine" presents a tougher task.

A dispute over a material fact is genuine if the "caliber" and "quantity" of

24

the evidence would "allow a rational finder of fact," *id*. at 254, to "return a verdict for the nonmoving party," *id*. at 248. In passing on summary judgment, a court must accept the nonmovant's evidence as true and assume all justifiable inferences that can be drawn from it. *See id*. at 255. The court may not weigh the evidence, nor may it make credibility determinations. *Id*. at 249, 255.

That said, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

**2.      The District Court correctly applied the summary-judgment standard.**

**A.      Hodges' physically impossible "eyewitness" testimony is not enough to create a genuine issue of material fact.**

**i.       Under *Scott v. Harris*, 550 U.S. 372 (2007), the District Court did not have to credit testimony that was blatantly contradicted by the record.**

The District Court correctly applied the summary-judgment standard to dismiss the Plaintiffs' case. It accurately summarized the governing case law, JA 4184-85, then applied it to determine that the Plaintiffs had not

forecast sufficient evidence to create a genuine dispute of material fact, JA 4185-89.

The Plaintiffs disagree, leaning heavily on Hodges' "eyewitness" testimony that he saw the explosion beyond the damper. But eyewitness testimony that is blatantly contradicted by the documentary record is not sufficient to create a genuine dispute of material fact. *Scott*, 550 U.S. at 380. In *Scott*, the plaintiff's testimony that he was driving relatively safely during a high-speed chase was contradicted by undisputedly authentic footage from a police officer's dashboard camera. Instead of relying on the "visible fiction" put forward by the plaintiff, the Court "viewed the facts in the light depicted by the videotape." *Id*. at 381. Nothing in *Scott* limits the case's holding to video evidence, and the opinion's reasoning focuses on the documentary record rather than the specific characteristics of video. *Coble v. City of White House,* 634 F.3d 865, 868-69 (6th Cir. 2011). Indeed, this Court has interpreted *Scott* as an application of "the unremarkable principle that '[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party' when 'there is a *genuine*

26

dispute as to those facts.'" *Witt v. W. Va. State Police*, 633 F.3d 272, 277 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 380). There is no such dispute here.

The District Court applied this rule, citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013), for the proposition that it is proper to discount a plaintiff's testimony at summary judgment when "it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to laws of nature." JA 4186. The Plaintiffs do not dispute that *Feliciano* accurately summarizes the law. Br. 17-18.

## ii.    Hodges' testimony was blatantly contradicted by the record.

Under *Scott* and its lineage, the District Court was within its rights to discount Hodges' testimony. Hodges plainly and unequivocally stated that he saw *over* the damper and further down the duct to watch a fireball coming at him from the baghouse. JA 2373. That is impossible. All of the parties agree about the physical setup of the damper. All of the parties agree that it hinged at the top. Br. 10. It necessarily follows that Hodges could not have seen over the damper. *E.g.*, JA 4179. Hodges' testimony to

27

the contrary was therefore not enough to create a genuine issue of material fact.

The Plaintiffs try to avoid this result by conceding that Hodges inaccurately described the damper's hinge, but insisting that he stood firm on what they consider "the heart of the matter"—namely, his claim that he saw the explosion coming from beyond the damper. They argue that "[a]s long as the witness holds to the 'heart' of his testimony, the rest is a credibility question." Br. 1. Not so. *Scott* and its progeny teach that a court need not credit "visible fiction" like Hodges' self-serving testimony. A genuine dispute of material fact is one that would allow a *reasonable* jury to find in the nonmovant's favor, and no reasonable jury would accept testimony that is flatly contradicted by the uncontested facts of the case.

To bolster Hodges' testimony, the Plaintiffs argue that "[w]here there is an opening—no matter where it is—there is the ability to see beyond." Br. 14. They misread the record. Hodges testified that the bottom of the damper was propped up by four to five inches of dust, which was holding it open. JA 2312, 2372. If the damper had pivoted from the middle, as he testified, JA 2373, this would have meant that there was an opening;

28

propping up the bottom of the flap would clear an equivalent amount of space at the top, so that Hodges potentially could have seen over the damper. But if the damper was hinged at the top—as all the parties agree it was—the fact that it was propped up by a pile of dust would not let Hodges see beyond it. Instead, the damper's flap would be resting on the dust and blocking Hodges view. There would be no opening. This is exactly what Hodges described; he said that the flap was "laying on" the dust. JA 2372. So he couldn't have seen over the damper, and he couldn't have seen under it.

Nor can the Plaintiffs reasonably argue that the dust was built up on one side of the duct, propping the damper open but leaving Hodges four to five inches of viewing space on the other side. That would not be a justifiable inference drawn from the evidence; it would be total speculation. And it would be directly contrary to Hodges' testimony that he saw *over* the damper, not around or under it, and that the damper's flap was *laying on* the dust. JA 2372-73.

The Plaintiffs try to minimize the contradictions in Hodges' testimony, characterizing the damper's setup as a "tangential detail[]" and

arguing that eyewitnesses to traumatic events like robberies and murders get details wrong all the time. Br. 16-17. This argument goes to the weight of his testimony, which is irrelevant at summary judgment. But to the extent that the Plaintiffs make it an issue, Hodges' testimony about the physical setup of the pipe wasn't a detail—it was at the core of his testimony. To play out the Plaintiffs' analogy, he did not get the color of a bank robber's shirt wrong; his testimony put him in a place where he couldn't even see into the bank in the first place. The Plaintiffs downplay the importance of the physical setup, insisting that Hodges "did not care how some damper was configured. All he cared about was the dust and then the ball of fire." Br. 17. This argument ignores the fact that Hodges was spending New Year's Eve on a scissors lift in a factory for exactly one reason: to clean out the duct and the damper. Of course he cared how the damper was configured. The physical setup of the duct was crucial to his job.

The Plaintiffs further try to rehabilitate Hodges by arguing that this Court applies special rules to eyewitness testimony, and that as long as

such testimony remains constant on the "heart of the matter," other inconsistencies are immaterial. They are wrong for at least three reasons.

First, the Plaintiffs do not appear to have raised this argument in the trial court. The Defendants have been unable to find an instance where the Plaintiffs advised the District Court of their heart-of-the-matter doctrine, cited the cases they raise on appeal, or gave the District Court a fair opportunity to rule on the issue.[5] This Court generally will not consider issues raised for the first time on appeal absent exceptional circumstances like plain error or a miscarriage of justice. *E.g., Williams v. Prof'l Transp., Inc.*, 294 F.3d 607, 614 (4th Cir. 2002). The Plaintiffs point to no such circumstances, and none are present.

Second, Hodges can hardly be called an "eyewitness" to events that he could not have possibly seen. This answers the Plaintiffs' opening salvo, where they argue that "[i]f a witness testifies that a traffic signal was green, it would be passing strange for a court to find as a matter of law that there is no evidence that the light was green. It would be error for the court to

---

[5] The Plaintiffs did argue that the jury was not required to reject all of Hodges testimony because part of it was false, JA 3932-33, 4078, but that is not the same argument that they raise on appeal. *Compare id. with* Br. 1, 13-14, 19-21.

grant summary judgment on that basis." Br. 1. That is true, as far as it goes—but the answer would surely be different if all of the parties agreed that the Plaintiffs' witness was sitting in a room with no windows, and he nonetheless testified that he saw through the window that the traffic signal outside was green. In that case, it would be totally appropriate to find as a matter of law that there is no evidence that the light was green, and it would be equally appropriate to grant summary judgment on that basis. That's exactly what the District Court did here.

Third, the Plaintiffs overstate their position. They try to stretch one published opinion and a pair of per curiam table cases into a controlling "heart-of-the-matter" doctrine. Their authorities are easily distinguishable, and they cannot sustain this burden.

The Plaintiffs' first case, *Thompson v. Hall,* 883 F.2d 70, 1989 U.S. App. LEXIS 22649 (4th Cir. 1989) (per curiam) (table), is irrelevant. It does not mention the Plaintiffs' "heart-of-the-matter" doctrine at all. It's just a due-process case holding that a drug test with a 95-98% confidence factor can constitute the evidence necessary to support a disciplinary sanction. *Id.* at *5-6. The *Thompson* court notes in passing that eyewitness testimony is less

than 100% reliable, but has nonetheless been recognized as legally sufficient. *Id.* at 6.

Equally far afield is *N.L.R.B. v. Hartley Oil Co., Inc.*, 210 F.3d 361, 2000 U.S. App. LEXIS 5181 (4th Cir. 2000) (per curiam) (table). That case concerns the deferential standard of review for the appeal of a National Labor Relations Board decision finding that an employer, Hartley Oil, had discriminated against an employee for joining a union. *Id.* at *6-7. The *Hartley* Court decided that inconsistencies in the employee's testimony regarding exact dates and the precise sequence of events when he punched out of work for the last time were not the sort of "exceptional circumstances" that would allow a reviewing court to disturb the Board's findings. *Id.* at *8-9. It deferred "to credibility determinations made by the factfinder when the inconsistencies in a witness's testimony do not go to the 'heart' of the testimony," citing *Minyard Enterprises, Inc. v. Southeastern Chemical & Solvent Co.,* 184 F.3d 373, 381 (4th Cir. 1999). *Id.* at *9.

*Minyard Enterprises*, in turn, is a CERCLA case. At issue was whether the defendant, Southeastern, was responsible for puncturing an underground storage tank that contained toxic solvents like paint thinner,

spilling them into the environment. After a bench trial, the magistrate

judge found that Southeastern was responsible for the contamination. *Id.* at

377.

On appeal, Southeastern challenged the fact-finding that it had

ruptured the tank as clearly erroneous. *Id.* at 377. This Court disagreed,

holding that the finding was supported by soil samples taken from the site.

*Id.* at 380. It also determined that the finding was supported by the

eyewitness testimony of Kenneth Broome, who testified that he was

working at the site on a Saturday when he saw a Southeastern work crew

puncture the tank with a backhoe. *Id.* at 380-81. A Southeastern employee

confirmed that Southeastern generally removes underground tanks by

digging a hole next to them with a backhoe, as Broome had described. *Id.* at

381. The Court noted that Broome's testimony, as corroborated by the

Southeastern employee, was "more than sufficient to support the

challenged finding." *Id.*

Southeastern arrayed three pieces of evidence against Broome's

testimony: (1) testimony from Broome's supervisor that Broome had

worked with him on a different job on November 22, 1988, the date that the

34

tank ruptured; (2) a work order showing that, on November 22, 1988,
Broome had worked with his supervisor for five and a half hours at a
different site; and (3) the fact that November 22, 1988, was a Tuesday,
while Broome had testified that he observed the accident on a Saturday. *Id.*

The Court explained that this evidence did not compel the conclusion
that the magistrate judge had clearly erred in crediting Broome's
testimony. *Id.* at 381. First, the supervisor's testimony and the work-order
record did not foreclose the possibility that Broome had worked part of the
day at the Southeastern job site. *Id.* Broome's supervisor never testified that
he and Broome had spent the entire day at the other site, and the work-
order accounted for only part of the work day. *Id.* Moreover, Broome's
recollection about the day of the week was a minor inconsistency that did
not require the magistrate judge to reject the heart of his testimony. *Id.*
Because the Court was not left with the definite and firm conviction that a
mistake had been committed, it affirmed the magistrate judge's finding. *Id.*

Thus, to whatever limited extent they are relevant, *Hartley Oil* and
*Minyard Enterprises* deal with inconsistencies in minor details, like the exact
day of the week when something happened. Here, by contrast, Hodges did

35

not get the trivia wrong—he was flatly mistaken about a key aspect of his

testimony, the physical setup of the product that allegedly injured him.

Further, in *Minyard Enterprises,* the various pieces of evidence could be

reconciled; crediting the work order and the supervisor's testimony would

not require the fact finder to reject Broome's account or render it

impossible. Here, however, all of the parties agree that Hodges could not

have seen over the damper.

**B.     The Plaintiffs' other purportedly corroborating evidence is not
enough to create a question of fact for the jury.**

**i.     The District Court did not invent and apply a new
"conclusiveness" standard.**

The District Court was also correct to reject the Plaintiffs' other,

supposedly corroborating evidence. The Plaintiffs claim that the District

Court improperly assessed that evidence on a "conclusiveness" standard.

Br. 14; *see also id*. at 18. They misread the lower court's opinion. The District

Court recited and applied the summary-judgment standard. JA 4184-85. It

did not fashion a new standard out of whole cloth. It just noted, correctly,

that Spangler's testimony and the video evidence are "inconclusive" and

"provide no clue as to how and where the fire and explosion began and,

critically, whether the claimed defects of the damper and backhouse caused

36

plaintiffs' injuries." JA 4187; *see also id*. at 4183 (observing that the video evidence "is, at best, in[con]clusive."). These two isolated uses of the word "inconclusive" in a 34-page opinion do not represent the creation and implementation of a new legal doctrine. They're just part of the reasonable observation that the Plaintiffs' limited evidence cannot make out a genuine issue of material fact on the critical issues presented.

ii.    **Spangler's testimony will not help a reasonable jury determine what caused either the explosion or the Plaintiffs' injuries.**

Taking Spangler's testimony first: Viewed in the light most favorable to the Plaintiffs, he was approaching an open door that faced the baghouse when he walked into a disorienting explosion, and was hit by a blast from the direction of the baghouse. JA 2675. This testimony will not help the jury determine where the fire started. There is no dispute that the baghouse exploded, just like there is no dispute that the Plaintiffs were burned by fire inside the plant. Even giving the Plaintiffs the benefit of every inference, Spangler's story will not help the jury determine how or where the fire started, or whether the alleged defects in the dust-collection system caused or contributed to the explosion.

37

### iii. The video evidence will not help a reasonable jury determine what caused either the explosion or the Plaintiffs' injuries.

The video evidence offers the Plaintiffs no more help. It does not show the baghouse, the ductwork, or the Plaintiffs. Thus, as the District Court observed, it does not provide direct evidence of any of the key issues in the case. Instead, the video shows a bright flash of white light, followed by people entering and exiting the plant. Neither side has identified an expert in video, photography, or lighting. The video evidence—whether taken alone or considered with the Plaintiffs' other evidence—is simply not enough to let a reasonable jury conclude anything about the cause or origin of the fire, or any relationship it may have had to the alleged defects in the dust-collection system.

Finally, the Plaintiffs insisted below that a lay juror could simply look at the ductwork and determine for herself that the explosion began in the baghouse, not in the duct. The District Court properly rejected this argument, JA 4188, and the Plaintiffs do not press it on appeal (although they do make a few cryptic references to "the physical evidence," Br. 12, 18). Should the Plaintiffs decide to raise this point for the first time in their reply brief, it is sufficient to observe that they lack any expert testimony to

support it. They have no evidence of the forces involved, the heat of the explosion, or the strength of the ductwork. To ask lay jurors to eyeball pictures of the ductwork and then determine whether a dust explosion had started there would invite total speculation.

## C.    The District Court did not make improper credibility determinations.

Finally, there is no basis for the Plaintiffs' intimations that the District Court made improper credibility determinations or weighed the evidence. *E.g.*, Br. 21 ("It is clear from its Opinion that the District Court just does not believe the Plaintiffs' evidence."); *see also* Br. 13. To the contrary, the District Court just considered whether the Plaintiffs had forecast enough evidence to create a question of fact for the jury—as it was required to do in light of the Defendants' motions. And the Plaintiffs' protests are particularly inappropriate in the context of this case, where the District Court held two lengthy hearings, during which it was fully engaged and asked numerous questions showing that it had worked through an enormous record. JA 3818-3968, 4028-4157. The result of its efforts came a month later—a 34-page opinion that is thoroughly researched and lucidly

reasoned. The Plaintiffs' suggestion that they were denied a fair hearing simply does not comport with the record.

**3.    As the District Court correctly observed, the Plaintiffs cannot exclude other potential causes of the explosion.**

In their brief, the Plaintiffs completely overlook a crucial part of the District Court's reasoning: Their case must fail because, even viewed in the light most favorable to them, the evidence establishes an accident with several potential causes, and the Defendants are not responsible for all of them. JA 4188-89. Standing alone, this ruling justifies the District Court's holding.

To recover in a products-liability suit in Virginia, a plaintiff must prove that (1) the product at issue contained a defect that existed when it left the defendant's hands; (2) the defect made the product unreasonably dangerous for ordinary and foreseeable use; and (3) the defect actually caused the plaintiff's injury. *Alevromagiros v. Hechinger Co.,* 993 F.2d 417, 420 (4th Cir. 1993); *Logan v. Montgomery Ward & Co.,* 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975). The plaintiff must also show why and how the accident happened. *Lawson v. Doe*, 239 Va. 477, 482, 391 S.E.2d 333, 335 (1990). Virginia's products-liability law "does not permit recovery where

40

responsibility is conjectural." *Boyle v. United Technologies Corp.*, 792 F.2d 413, 415 (4th Cir. 1986). Where there is more than one possible cause of an injury, the plaintiff must show with reasonable certainty that the defendant caused that injury. *Stokes v. L. Geismar, S.A.*, 815 F. Supp. 904, 908 (E.D. Va. 1993), *aff'd*, 16 F.3d 411 (4th Cir. 1994).

Thus, when two or more potential causes of an accident exist and the defendant would not be responsible for one of them, the defendant is entitled to judgment as a matter of law. *Boyle*, 792 F.2d at 416.

Here, there are two potential causes of the explosion: (1) the static electricity generated by the Plaintiffs' vacuuming, and (2) a spontaneous combustion in the baghouse. Without expert testimony, the Plaintiffs cannot show that one cause is more likely than another, so their case must fail.

The Defendants, on the other hand, have put forward expert testimony in support of the first theory. That expert testimony explains all of the physical facts of the accident—including the eyewitness testimony and the video evidence—and it therefore defeats the Plaintiffs' case. After reviewing the facts of the case, Richard J. Roby, PhD, PE, concluded that

41

static sparks from the Plaintiffs' ungrounded vacuum apparatus ignited a cloud of dust in the duct. JA 508. After ignition, the flame traveled in both directions, both toward the Plaintiffs and toward the baghouse. JA 508. The flame that headed toward the Plaintiffs ignited their paper Tyvek suits, burning them, and the wave that traveled toward the baghouse caused "a considerable explosion and overpressure event." JA 508.

Dr. Roby considered but rejected the Plaintiffs' theory that the explosion started in the baghouse. JA 509. To begin with, he determined that the video footage from the security camera showed that the first flash occurred inside the plant, not outside at the baghouse. JA 509. He supported that conclusion with a detailed analysis of the camera footage. JA 514-517, 520, 557-59.

Second, the post-incident condition of the ductwork suggested that the explosion had started inside the plant, not outside. JA 509. The section of the ductwork heading toward the baghouse was displaced in the direction of the baghouse, not vice versa. JA 509. Had the initial explosion occurred in the baghouse, the pressure wave would have pushed the duct in the opposite direction—that is, *away* from the baghouse. JA 509. Further,

42

because there was a damper in the ductwork between the workers and the baghouse, if the explosion had started in the baghouse, the force on the damper would have pushed the piping back toward the inside of the building. JA 509. In fact, the exact opposite occurred.

Finally, there was no ignition source in the baghouse except a flame propagating from an ignition where the Plaintiffs were vacuuming. JA 510. Dr. Roby rejected the Plaintiffs' spontaneous-combustion theory because of the weather conditions in Blacksburg on December 31, 2010. JA 510-11, 524, 560-61.

Dr. Roby also explained Hodges' testimony that he saw the flames traveling from beyond the damper toward him. JA 518. He noted that, while Hodges may have been looking down the duct work at the time of the incident, he had about eight feet of PVC extension in front of him, so the ignition point would have been at least eight feet away. Hodges therefore would have had difficulty identifying the origin of the flame, because it would be traveling in both directions from the point of ignition at a very fast speed. JA 518. Hodges may well have perceived that the flame was beyond the damper when he first saw it. But as Dr. Roby

43

explained, "his observations are not as reliable as the known physical evidence in this matter and the laws of physics, and can be explained as unreliable when carefully examined as required by NFPA 921." JA 518; *see also* JA 556-57.

Without expert testimony, the Plaintiffs cannot overcome Dr. Roby's explanation; once Hodges' impossible testimony is removed from the equation, a jury could view the facts in the light most favorable to the Plaintiffs, grant them the benefit of every reasonable inference, and *still* agree with Dr. Roby. This is presumably what the District Court meant when it called their evidence inconclusive. It also prevents the Plaintiffs from ruling out the possibility that they, rather than the Defendants, are at fault. *Cf. Logan*, 216 Va. at 429, 219 S.E.2d at 688 ("The evidence in the instant case fails to eliminate the possibility that the blame attaches to some party other than [the defendant]. Neither is the proof such that the existence of a defect in the [product] is the only reasonable inference that can be drawn to explain the explosion.").

**4.    Without expert testimony on causation, the Plaintiffs cannot prove that any alleged defect in the dust-collection system proximately caused their injuries.**

To survive summary judgment, the Plaintiffs have to prove that the alleged defects in the dust-collection system proximately caused their injuries.[6] "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Blue Ridge Services Corp. v. Saxon Shoes, Inc.*, 271 Va. 206, 218, 624 S.E.2d 55, 62 (2006). "Virginia follows the 'but for' rule of proximate causation, which states that a defendant is not liable unless the harm would

---

[6] The District Court ruled on proximate causation. Among other things, it held that there was "no evidence that a product defect caused or contributed to the plaintiffs' injuries . . . " JA 4189. To the extent that the District Court did not apply the precise line of reasoning set out in this brief, the Court should nonetheless affirm its judgment, even if it decides the case for different reasons. *See, e.g., Richmond Med. Ctr. for Women v. Gilmore*, 224 F.3d 337, 338 (4th Cir. 2000) (per curiam). The Court reviews judgments, not statements in opinions, *id.*, and it is free to affirm a judgment on any ground appearing in the record, *Toll Bros. v. Dryvit Sys.*, 432 F.3d 564, 572 (4th Cir. 2005). The Defendants raised the proximate-causation argument below. *E.g.*, Dustex Mem. in Supp. of Mot. for Summ. Judgment 10-11, Dec. 11, 2013 (ECF No. 77); Defs. the Kirk & Blum Mfr. Co. & K&B Duct's Mot. for Summ. Judgment and Mem. in Supp. 5-7, Dec. 11, 2013 (ECF No. 84).

not have occurred but for the defendant's act." *Marchant v. Boddie-Noell Enterprises, Inc.*, 344 F. Supp.2d 495, 497 (W.D. Va. 2004).

Here, while the Plaintiffs allege that the baghouse was inadequately vented and that the damper should have been constructed more robustly, they have no expert testimony connecting those alleged defects to their injuries. The Plaintiffs trumpet Schloss' opinion that the venting on the baghouse did not meet industry standards. Br. 6. But they neglect to mention that Schloss himself testified that it would have made no difference if the baghouse venting had met industry standards. The Plaintiffs still would have been injured, irrespective of the size of the venting. JA 3528. Here is Schloss' exact testimony on this point:

Q      All right.  Had the blast doors been of the size that you specify in your report, which were I think approximately double in size, do you have an opinion as to whether or not there would have been any heat energy that would have traveled in a reverse flow back up the ductwork in any event?

A      It's an explosion.  It's going to go up that duct. It doesn't—it doesn't look at it and say, well, oh, here is a door that I can blow open. Let me wait until the door opens up, and then we will all go out there.

It still went through the fan. It went back through that duct, went down into the 55-gallon drum. And that's why

46

> NFPA requires that you isolate all those to eliminate a future problem.
>
> Q     So there would have been a fireball going back toward those two plaintiffs on the scissor lift in any event?
>
> A     *In any event, you would have had a fireball going back through there because you had an explosion in the bag house, yes*.

JA 3527-28 (emphasis added).

If the Plaintiffs' own evidence establishes that the allegedly defective baghouse venting was not a but-for cause of their injuries, then they cannot possibly recover on that theory.

As for the damper, Hodges testified that it was held open by four to five inches of dust. JA 2312. Even on the Plaintiffs' theory that the damper was an explosion-containment device, this is not how the damper was designed to operate. Instead, according to the Plaintiffs, the damper's flap was designed to slam shut in the event of an explosion from the baghouse. JA 3531, 3816-17. The state of the duct rendered this impossible. That forecloses recovery against Kirk & Blum because a manufacturer cannot be held liable for the unforeseeable misuse of its product. *See Jeld-Wen, Inc. v. Gamble*, 256 Va. 144, 149-50, 501 S.E.2d 393, 397 (1998). Further, there is no

allegation or evidence that any of the Defendants but Federal-Mogul was responsible for the maintenance or cleaning of the dust-collection system.

Finally, Plaintiff's expert McGinley testified that the Plaintiffs would have been injured irrespective of where the fire started. JA 3190-92. This undermines the Plaintiffs repeated insistence that the key question in the case is where the fire started. Br. 13, 15, 16. And to the extent that the fire's origin remains an important question, it is not the *only* question in the case. *Cf.* Br. 1 ("The question in this appeal is where the fire that seriously injured Jeffrey Hodges, Tommy Lee Bonds, and John Paul Spangler started."). The Plaintiffs still have to prove that a defect proximately caused their injuries. As the District Court correctly held, they simply do not have the proof to make out a genuine issue of material fact on this point. JA 4189.

## Conclusion

The Court should affirm the District Court's judgment.

Federal-Mogul Corporation, Q-Tech
Equipment & Services of the Carolinas,
L.L.C., Carrington Engineering Sales
Co., Dustex Corporation, The Kirk &
Blum Manufacturing Company, and
K&B Duct

 /s/ James J. O'Keeffe

Guy M. Harbert III
James J. O'Keeffe IV
Daniel R. Sullivan
GENTRY LOCKE RAKES & MOORE LLP
10 Franklin Road, SE, Suite800
Roanoke, Virginia  24022
T:  540.983.9349
*Counsel for Federal-Mogul Corporation*

David Drake Hudgins
HUDGINS LAW FIRM
515 King Street, Suite 400
Alexandria, Virginia  22314
T: 703-837-3206
*Counsel for Dustex Corporation*

Bevin Ray Alexander, Jr.
James Barrett Lucy
FREEMAN, DUNN, ALEXANDER, GAY
LUCY & COATES, P.C.
1045 Cottontown Road
Lynchburg, Virginia  24503
T: 434.485.5126
*Counsel for Q-Tech Equipment & Services
of the Carolinas, L.L.C. and Carrington
Engineering Sales Co.*

Donald Edward Morris
LAW OFFICES OF ANTONY K. JONES
3957 Westerre Parkway, Suite 320
Richmond, Virginia  23233
T: 804-934-2682
*Counsel for The Kirk & Blum
Manufacturing Company and K&B
Duct*

## Statement Regarding Oral Argument

This case does not merit oral argument. It presents an "utterly routine" application of summary-judgment procedure. *See Tolan v. Cotton,* 134 S.Ct. 1861, 1868-69 (2014) (Alito, J., concurring) (explaining that "[t]here is no confusion in the courts of appeals about the standard to be applied in ruling on a summary judgment motion . . . ."). In fact, the Plaintiffs themselves acknowledge that their case doesn't raise a novel proposition. Br. 23. Although the summary-judgment record is lengthy, the Plaintiffs protest the District Court's treatment of three discrete pieces of evidence, all of which are easily understood and exhaustively addressed in the briefs. All of the relevant materials are included in the Joint Appendix. The Defendants agree with the Plaintiffs that the standards governing summary-judgment practice are important. But they are also uncontroversial and well-established, and there is no magic to applying them here.

If the Court should disagree and grant oral argument, the Defendants ask to participate.

## Certificate of Compliance with Rule 28.1(e) or 32(a)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(b) because this brief contains <u>9,697</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (i.e., the corporate disclosure statement, table of contents, table of citations, statement with respect to oral argument, any addendum containing statutes, rules, or regulations, and any certificates of counsel).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point serifed typeface, Book Antiqua, using Microsoft Word 2010.

<u>/s/ James J. O'Keeffe, IV</u>
Attorney for Federal-Mogul Corporation
Dated: October 16, 2014

51

## Certificate of Service

In accordance with Local Rules 31(c) and 31(d), I hereby certify that on the 16th day of October, 2014, eight copies of the foregoing Brief of Appellee were mailed to the Clerk of the United States Court of Appeals for the Fourth Circuit, and further certify that one copy was mailed to

E. Kyle McNew
MICHIEHAMLETT, PLLC
500 Court Square, Suite 300
Charlottesville, Virginia 22902
(434) 951-7234

Neal Stanley Johnson
JOHNSON LAW PLC
120 Day Avenue, Suite 200
Roanoke, Virginia 24016
(540) 777-5297

Peter Brent Brown
BROWN & JENNINGS PLC
30 Franklin Road, Suite 700
Roanoke, Virginia 24011
(540) 444-4010

counsel for the Appellants.

/s/ James J. O'Keeffe, IV
Attorney for Federal-Mogul Corporation